IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
NORTHERN DIVISION
No. 2:13-CV-20-D

BRIAN C. LEE, SR., )
)
        Plaintiff, )
)
v. ) **ORDER**
)
THE TOWN OF SEABOARD, )
)
        Defendant. )

On July 17, 2013, Brian C. Lee, Sr. ("plaintiff" or "Lee") filed an amended complaint against the Town of Seaboard, North Carolina ("defendant" or "Town of Seaboard") [D.E. 13]. Lee's claims of assault and battery and negligence remain. The claims concern injuries that Lee sustained after one of the Town of Seaboard's police officers, Sergeant Harold Gray Phillips, Jr. ("Sergeant Phillips"), shot him. See id.

On June 26, 2015, the Town of Seaboard moved for summary judgment [D.E. 64], and Lee moved for partial summary judgment [D.E. 66]. Thereafter, each party responded [D.E. 70, 71] and replied [D.E. 74, 75]. Under North Carolina law, a law enforcement officer is justified in using deadly force upon another person to defend himself or a third person from what the officer reasonably believes to be the use or imminent use of deadly physical force. See N.C. Gen. Stat. § 15A-401(d)(2). Because Sergeant Phillips's conduct was justified under section 15A-401(d)(2), the court grants the Town of Seaboard's motion for summary judgment and denies Lee's motion for partial summary judgment.

I.

On the evening of May 14, 2010, Lee drove from Norfolk, Virginia, to Seaboard, North Carolina, to attend a party at a local Elks Lodge. Am. Compl. [D.E. 13] ¶ 11. Before leaving Norfolk, Lee drank alcohol at a wake. Lee Dep. [D.E. 72-1] 125–26.[1] After the wake, Lee drove his brother Michael Lee and his friend James Orr to Seaboard. See id. 127.

Lee and his two companions arrived to the Elks Lodge party at around 9:00 or 9:30 p.m. Id. 132. Lee drank alcohol at the party. Id. 151–52. A large crowd attended the party that evening, and most people were dancing and drinking alcohol. Id. 151–52, 154–55. Two Town of Seaboard police officers, Officer David Twine ("Officer Twine") and Sergeant Phillips, also attended. Am. Compl. ¶¶ 12–13; Ans. to Am. Compl. [D.E. 17] ¶¶ 12–13. Specifically, Sergeant Phillips was on duty and "patrolled the area around the Elks Lodge" in his official capacity. Ans. to Am. Compl. ¶ 13. Officer Twine "provided security for the party that night and did so in an off duty capacity." Id. ¶ 12; Reed Dep. [D.E. 72-3] 37–38.

After the party ended, approximately twenty or thirty people (including Lee) remained inside the Elks Lodge. Lee Dep. 153. Lee helped his cousin Ernest Flythe disassemble and pack his deejay equipment. Id. 161. When Lee exited the Elks Lodge, Lee found that "there was tension in the air with the Seaboard crowd" concerning Lee, Michael Lee, and Orr. Id. 161–62. Lee alleged in his complaint that some partygoers were upset because he and his two companions had been "somewhat popular that evening." Compl. [D.E. 1] ¶ 14; Am. Compl. ¶ 14. In his deposition, Lee testified that "never knew why" the Seaboard crowd was upset with him. Lee Dep. 161–62, 164. In any event, while Lee was in the Elks Lodge parking lot, around fifteen to twenty men began to "say[ ] stuff"

---

[1] All citations to depositions refer to the deposition page number. The first time a deposition is cited, the court notes its docket entry location.

2

to Lee and his two companions. Id. 162.

While Lee was walking to his car, one man in the crowd threw a drink on Lee. Id. 163. Another man hit Lee "in the face with [his] fist." Id. 164. Officer Twine and Sergeant Phillips observed the crowd and escorted Lee, Michael Lee, and Orr to Lee's car. Lee, Michael Lee, and Orr eventually got into Lee's car, and Sergeant Phillips told Lee to leave the parking lot. See Twine Dep. [D.E. 66-4] 39–41; Williams Aff. [D.E. 64-2] ¶¶ 3–8. Instead of leaving, Lee then exited his car and attempted to open his trunk in order to get a towel to wipe off the drink that had been thrown on him. Lee Dep. 165, 168. The officers, however, did not allow Lee to open his trunk, fearing he might remove a weapon. See Twine Dep. 90–91; cf. Lee Dep. 169 ("I don't know who closed the trunk .... I don't recall that part."). Lee then reentered his car. Lee Dep. 169. At that point, the Seaboard crowd grew angrier and began to jump on and kick Lee's car. Id. 165, 169–70. The Seaboard crowd "smashed in" the front windshield. Id. 165. Lee "decided to pull off." Id. 168; see Williams Aff. ¶¶ 3–8.

Lee began to drive his car while people were still standing on the car's hood. Lee Dep. 170. Orr and Michael Lee were seated in Lee's car when Lee began to drive to exit the parking lot. Twine Dep. 41–42. There also were people standing in the Elks Lodge parking lot when Lee began driving. Some of the people were very close to Lee's car and could have been hit by it. Lee Dep. 171. While still in the Elks Lodge parking lot, Lee repeatedly revved his car engine. Id. 172. When Lee reached Jordan Street, he turned left towards Jordan Street's dead end. Id. 171–72. Some pedestrians chased Lee's car, attempting to attack the car. See Phillips Dep. [D.E. 65-6] 59. Sergeant Phillips also chased Lee's car, attempting to arrest Lee because he believed that he saw Lee's car hit an individual in the parking lot. Id. 59–60, 88–89. Other pedestrians remained in the parking lot. See Phillips Dep. 39–40; Richardson Aff. [D.E. 64-1] ¶¶ 9–15.

3

As Lee approached Jordan Street's dead end, Lee had little visibility because the "windshield was smashed in[ ] and the crowd was still hanging on the car." Lee Dep. 173–74. After reaching the dead end on Jordan Street, Lee turned his car around and drove off the road. Id. 175.

As Lee was turning his car around, Officer Phillips retreated on Jordan Street towards the Elks Lodge. Phillips Dep. 37. Lee then began driving from the dead end on Jordan Street towards the Elks Lodge. At that point, Sergeant Phillips drew his weapon and shouted at Lee to "stop the car, stop the car." Id. 37–38, 83. Lee did not stop his car. Id. 37–38, 83–84. Sergeant Phillips then moved off Jordan Street, to the side of the road opposite the Elks Lodge. Id. 37–38; Cloutier Dep. [D.E. 71-2] 33. Lee's car began to accelerate, and the crowd of people attacking his car fell behind him. Lee Dep. 175–76 ("I don't know how fast. Probably about 15, 20 miles per hour."); Phillips Dep. 37–38, 81–82, 86. Lee then swerved off the road, tracking towards Sergeant Phillips. Phillips Dep. 83–84; see Cloutier Dep. 33 ("[The tire] impressions from Mr. Lee's vehicle . . . actually go off the road into a portion of the yard at 200 Jordan Street."). Sergeant Phillips was concerned about his safety and the safety of anyone further up Jordan Street, either in or near the Elks Lodge parking lot or walking on Jordan Street. See Phillips Dep. 37–38, 83–85.

Lee's car continued to approach Sergeant Phillips. Id. Due to Lee's erratic driving, Officer Twine and the pedestrians in and near the Elks Lodge parking lot ran for cover. See Twine Dep. 50; Richardson Aff. ¶¶ 13–14.

The parties dispute whether Lee's car hit Sergeant Phillips. Compare Lee Dep. 188 ("Is it possible you hit Sergeant Phillips that night? I really don't think so. You can tell if you hit somebody."), with Phillips Dep. 90 (testifying that Lee's car hit him); compare also Am. Compl.

4

¶ 40, with Ans. to Am. Compl. ¶ 40.² The parties also dispute whether Sergeant Phillips could have hidden behind a van parked on the side of Jordan Street before Lee's car came close to him. Compare Phillips Dep. 92–93, with Cloutier Dep. 28–29. In any event, the parties agree that Sergeant Phillips was within "five to ten feet away from the driver's door when he fired [two shots towards] Lee's car." Am. Compl. ¶ 40. When Sergeant Phillips fired his weapon, Lee's car was about even with Sergeant Phillips, and Lee had not yet passed the Elks Lodge, including the remaining pedestrians. Lee Dep. 177; Phillips Dep. 97–99; Richardson Aff. ¶¶ 13–14 (detailing how some pedestrians in the parking lot hid "behind the building" when Lee's car approached); Deloatch Aff. [D.E.64-3] ¶¶ 3–11; Dorrell Brown Aff. [D.E. 64-4] ¶¶ 2–7; Thomas Brown Aff. [D.E. 64-5] ¶¶ 2, 5. One bullet broke Lee's driver's side window and hit Lee in the forearm, shattering his ulna. Lee Dep. 183, 195. The other bullet lodged in the driver's side car door. Am. Compl. ¶ 42; Ans. to Am. Compl. ¶ 42; see Lee Dep. 181–83. "[F]rom start to finish," the whole incident occurred in "less than five minutes." Phillips Dep. 40.

Notwithstanding the gun shots, Lee kept driving. See Lee Dep. 183–84. Lee did not realize he had been shot. Id. 184–85. A few minutes later, two other law enforcement officers, not Sergeant Phillips or Officer Twine, activated their blue lights and stopped Lee's car. Id. 183–85.

After the police stopped Lee's car, the police called an ambulance. See id. 185–86. Lee was hospitalized at Pitt Memorial Hospital in Greenville, North Carolina. Id. 194. The State Bureau of

---

² Lee argues that Sergeant Phillips admitted in his answer that Lee's car did not hit him. See Pl.'s Response to Def.'s Mot. for Summ. J. [D.E. 71] 12. In his answer, Sergeant Phillips states both that he was "five to ten feet away from plaintiff's vehicle when he fired his weapon" and that his "left knee was hit by the front of the driver's side of the vehicle and that Sgt. Phillips fired his weapon at the time of impact." Ans to Am. Compl. ¶ 40. Reading the answer as a whole, Sergeant Phillips states that Lee's car clipped him. The car's impact then pushed Sergeant Phillips back, and Sergeant Phillips fired his weapon. See id. Sergeant Phillips's deposition confirms this reading. See Phillips Dep. 37–39.

5

Investigation examined Sergeant Phillips's use of force against Lee, but the State declined to charge Sergeant Phillips criminally. See id. 196–99; Reed Dep. 11–13. After the State declined to charge Sergeant Phillips criminally, the Town of Seaboard declined to initiate administrative proceedings against either Officer Twine or Sergeant Phillips. Reed Dep. 11–13, 27, 57. Sergeant Phillips later resigned from the Town of Seaboard Police Department. Id. 16.

II.

In considering a motion for summary judgment, the court views the evidence in the light most favorable to the non-movant and applies well-established principles under Rule 56 of the Federal Rules of Civil Procedure. See, e.g., Fed. R. Civ. P. 56; Scott v. Harris, 550 U.S. 372, 378 (2007); Celotex Corp. v. Catrett, 477 U.S. 317, 325–26 (1986); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–55 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 585–87 (1986). Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Anderson, 477 U.S. at 247–48.

The party seeking summary judgment must initially demonstrate an absence of a genuine issue of material fact. Celotex Corp., 477 U.S. at 325. Once the movant meets its burden, the nonmoving party then must affirmatively demonstrate that there exists a genuine issue of material fact for trial. See Matsushita, 475 U.S. at 587. "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. Conjectural arguments will not suffice. See id. at 249–52; Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985) ("The nonmoving party . . . cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another."). Nor will a "mere . . . scintilla of evidence in support of the [nonmoving party's] position . . . ; there must be evidence on

6

which the [fact finder] could reasonably find for the [nonmoving party]." Anderson, 477 U.S. at 252. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

A.

Lee seeks damages from the Town of Seaboard for assault and battery and contends that the Town of Seaboard is vicariously liable for Sergeant Phillips's use of force under the doctrine of respondeat superior. Am. Compl. ¶ 67.[3] "An assault is an offer to show violence to another without striking him, and a battery is the carrying of the threat into effect by the infliction of a blow." Dickens v. Puryear, 302 N.C. 437, 444, 276 S.E.2d 325, 330 (1981); Glenn-Robinson v. Acker, 140 N.C. App. 606, 624, 538 S.E.2d 601, 615 (2000). However, "[p]ursuant to the common law of North Carolina, an assault [or battery] by a law enforcement officer upon a citizen can provide the basis for a civil action for damages against the officer only if a plaintiff can show that the officer used force against plaintiff which was excessive under the given circumstances." Fowler v. Valencourt, 108 N.C. App. 106, 114, 423 S.E.2d 785, 790 (1992), rev'd in part on other grounds, 334 N.C. 345, 435 S.E.2d 530 (1993); Myrick v. Cooley, 91 N.C. App. 209, 214–15, 371 S.E.2d

---

[3] North Carolina state law governs this claim; therefore, the court must determine how the Supreme Court of North Carolina would rule on Lee's claim. See Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co., 433 F.3d 365, 369 (4th Cir. 2005). If the state supreme court "has spoken neither directly nor indirectly on the particular issue before [the federal court, that court must] . . . predict how [the state supreme] court would rule if presented with the issue." Id. (quotations omitted). In making that prediction, the court "may consider lower court opinions[,] . . . treatises, and the practices of other states." Id. (quotation omitted). When predicting an outcome under state law, a federal court "should not create or expand [a] [s]tate's public policy." Time Warner Entm't-Advance/Newhouse P'ship v. Carteret-Craven Elec. Membership Corp., 506 F.3d 304, 314 (4th Cir. 2007) (first alteration in original) (quotation omitted); Wade v. Danek Med., Inc., 182 F.3d 281, 286 (4th Cir. 1999).

7

492, 496 (1988).

Although North Carolina law permits a plaintiff to seek damages for excessive force against a police officer, North Carolina law has long recognized the unique challenges that police officers face when protecting the public. See, e.g., Todd v. Creech, 23 N.C. App. 537, 539, 209 S.E.2d 293, 295 (1974). When faced with a threat of serious bodily injury to himself or another, a police officer may use deadly force. See State v. Fain, 229 N.C. 644, 646, 50 S.E.2d 904, 905–06 (1948). Moreover, a police officer's judgment in assessing a risk need not be perfect. "Within reasonable limits[,] the officer has discretion to determine the amount of force required." Todd, 23 N.C. App. at 539, 209 S.E.2d at 295. Flexibility is necessary in analyzing an officer's use of force, given the "split-second decisions [inherent] in matters affecting public safety." N.C. Dep't of Env't & Nat. Res. v. Carroll, 358 N.C. 649, 668, 599 S.E.2d 888, 900 (2004); see Fain, 229 N.C. at 646, 50 S.E.2d at 905.

The General Assembly enacted North Carolina General Statute § 15A-401 to codify and clarify "those situations in which a police officer may use deadly force without fear of . . . civil liability." State v. Irick, 291 N.C. 480, 501, 231 S.E.2d 833, 846 (1977). Section 15A-401(d) states in relevant part:

> A law-enforcement officer is justified in using deadly physical force upon another person . . . only when it is or appears to be reasonably necessary thereby . . . [t]o defend himself or a third person from what he reasonably believes to be the use or imminent use of deadly physical force . . . . Nothing in this subdivision constitutes justification for willful, malicious or criminally negligent conduct by any person which injures or endangers any person or property, nor shall it be construed to excuse or justify the use of unreasonable or excessive force.

N.C. Gen. Stat. § 15A-401(d); Gillis v. City of Charlotte, No. 3:13-CV-260-DSC, 2014 WL 1333988, at *5–7 (W.D.N.C. Apr. 2, 2014) (unpublished); Fields v. Tucker, No. 1:10CV844, 2011 WL 4345306, at *5–6 (M.D.N.C. Sept. 15, 2011) (unpublished); London v. Hamilton, No. CA

8

3:95CV347-MCK, 1996 WL 942865, at *9 (W.D.N.C. Nov. 27, 1996) (unpublished); Wilcox v. City of Asheville, 222 N.C. App. 285, 290–95, 730 S.E.2d 226, 231–34 (2012); Turner v. City of Greenville, 197 N.C. App. 562, 566–68, 677 S.E.2d 480, 483–84 (2009); Williams v. City of Jacksonville, 165 N.C. App. 587, 594–95, 599 S.E.2d 422, 429–30 (2004); Hinton v. City of Raleigh, 46 N.C. App. 305, 307–08, 264 S.E.2d 777, 778–79 (1980).

North Carolina defines a "deadly weapon 'as any instrument which is likely to produce death or great bodily harm, under the circumstances of its use.'" State v. Batchelor, 167 N.C. App. 797, 800, 606 S.E.2d 422, 424 (2005) (alterations omitted) (quoting State v. Smith, 187 N.C. 469, 470, 121 S.E. 737, 737 (1924)). A "car sitting idle may not be deadly." Id., 606 S.E.2d at 424. However, when an individual drives a vehicle towards an officer or other person, even at those speeds attainable within a driveway, the individual has employed deadly physical force. Id., 606 S.E.2d at 424.

A genuine issue of material fact exists concerning whether Lee's car hit a pedestrian while leaving the parking lot and hit Sergeant Phillips before Sergeant Phillips shot Lee. Nonetheless, even reviewing the record in the light most favorable to Lee, when Sergeant Phillips fired his weapon, Sergeant Phillips's conduct was justified under section 15A-401(d)(2). As discussed, Sergeant Phillips witnessed Lee interacting with a violent and angry mob in the Elks Lodge parking lot. During the fracas, someone smashed Lee's windshield. Lee began to drive out of the parking lot while people stood on the hood of his car. On his way out, Lee revved his engine and nearly hit an individual in the parking lot. Lee turned left on Jordan Street, his smashed windshield partially obscuring his vision. Sergeant Phillips then saw Lee's car, pursued by an angry mob on foot. Sergeant Phillips also followed and tried to arrest Lee because he believed that Lee's car had hit an individual in the parking lot. Lee drove his car off Jordan Street at the dead end. Sergeant Phillips

9

then watched as Lee turned the car around and accelerated back towards the Elks Lodge on Jordan Street.

Meanwhile, Sergeant Phillips began to retreat, drew his weapon, and repeatedly shouted at Lee to stop the car. Phillips Dep. 82–85. Lee ignored Sergeant Phillips's commands, continued to drive his car towards Sergeant Phillips, and continued to accelerate. See id. Sergeant Phillips then moved off Jordan Street onto the grass. See id. 83–84. He witnessed Lee's car "track[ing] him," as the car swerved off the road and towards Sergeant Phillips. Id.; Cloutier Dep. 33. Sergeant Phillips was worried about both his safety and the safety of pedestrians slightly further up the road. See Phillips Dep. 83–85.

Even viewing the record in the light most favorable to Lee, Sergeant Phillips "could have reasonably believed that [Lee] posed an imminent threat to [himself] and nearby civilians" and was "justified in using deadly physical force under section 15A-401(d)(2)." Turner, 197 N.C. App. at 568, 677 S.E.2d at 484; see Fields, 2011 WL 4345306, at *5–6; London, 1996 WL 942865, at *9; Hinton, 46 N.C. App. at 306–08, 264 S.E.2d at 778–79; accord Waterman v. Batton, 393 F.3d 471, 479–80 (4th Cir. 2005); Scott v. Edinburg, 346 F.3d 752, 758–61 (7th Cir. 2003). Thus, the court grants summary judgment to the Town of Seaboard on Lee's assault and battery claim.

In opposition to this conclusion, Lee makes four arguments. First, Lee argues that Sergeant Phillips "had no specific knowledge of anyone in front of Plaintiff's car." Pl.'s Response to Def.'s Mot. for Summ. J. 20; see Phillips Dep. 64, 92. However, section 15-404(d)(2) does not require specific knowledge that the degree of force used is necessary. It merely requires a reasonable belief that the force is necessary. See, e.g., N.C. Gen. Stat. § 15A-401(d)(2); Turner, 197 N.C. App. at 568, 677 S.E. 2d at 484. "[N]ecessity (real or apparent)[ ] is the ground upon which the law permits (the use of deadly physical force) in such cases." Fain, 229 N.C. at 646, 50 S.E.2d at 906. Sergeant

10

Phillips reasonably believed that pedestrians were present in the immediate area and in imminent danger due to Lee's erratic driving. See Phillips Dep. 18 ("Most of the people that were at the party lived right there in Seaboard, so it's pretty much walking distance. If you know Seaboard's town limits, I mean, it's walking distance to there. So, you know, they're not going to drive when they can just walk."); 82 ("And were you concerned that other people were also in the area of the Elks Lodge and then also walking home on Jordan Street? Yes ma'am, behind me, yes."); 83 ("I was afraid that he was going to hit me as well as if he got past me if he was going to hit anyone else."). Indeed, Lee admits that if anyone had entered Jordan Street, his car "would have hit somebody." Lee Dep. 176. Furthermore, Sergeant Phillips also acted reasonably in deciding not to take his eyes off Lee's car in order to turn around and assess whether pedestrians were in danger. See Carroll, 358 N.C. at 668, 599 S.E.2d at 900. Accordingly, Sergeant Phillips's testimony that he lacked specific knowledge of any pedestrians on Jordan Street at the moment he fired his weapon fails to create a genuine issue of material fact.

Second, Lee argues that Sergeant Phillips unjustifiably shot him when he was simply "compl[ying] with Sgt. Phillips' order to leave and tried to escape an attacking mob." Pl.'s Response to Def.'s Mot. for Summ. J. 20. However, Sergeant Phillips told Lee to leave before the Seaboard mob attacked Lee's car and shattered his windshield. See Twine Dep. 39–41. Moreover, Lee turned left on Jordan Street instead of right, causing Lee to have to turn around and drive past the Elks Lodge. Lee then drove erratically towards the Elks Lodge and Sergeant Phillips and ignored Sergeant Phillips's commands to stop the car. Even viewing the record in the light most favorable to Lee, Sergeant Phillips was justified in firing his weapon. See, e.g., Turner, 197 N.C. App. at 568, 677 S.E.2d at 484; Fields, 2011 WL 4345306, at *5–6; London, 1996 WL 942865, at *9; Hinton, 46 N.C. App. at 306–08, 264 S.E.2d at 778–79.

11

Third, Lee argues that "[a]ny belief by Sgt. Phillips that Plaintiff posed an imminent threat to others is completely undercut by the fact that there were no other people in the potential path of Plaintiff's car." Pl.'s Response to Def.'s Mot. for Summ. J. 20. Again, however, Lee bases this assertion on the testimony of Sergeant Phillips that he lacked personal knowledge of anyone in the potential path of Lee's car. Sergeant Phillips, however, reasonably believed that pedestrians were in imminent danger, and Sergeant Phillips was justified in firing his weapon to protect them. See, e.g., Turner, 197 N.C. App. at 568, 677 S.E.2d at 484; Fields, 2011 WL 4345306, at *5–6; London, 1996 WL 942865, at *9; Hinton, 46 N.C. App. at 306–08, 264 S.E.2d at 778–79.

Finally, plaintiff's expert Dave Cloutier criticizes how Sergeant Phillips and Officer Twine managed the events leading to Sergeant Phillips's use of deadly force. See Cloutier Dep. 11–12 (discussing Officer Twine's failure to arrest Lee when Officer Twine believed that Lee was intoxicated); 19–20 (criticizing Sergeant Phillips's decision to pursue Lee on foot instead of in a patrol car); 28–29 (criticizing Sergeant Phillips's decision to first stand in the road in order to yell at Lee to stop his vehicle, before retreating to the side of the road). Cloutier admits, however, that the reasonableness of a decision to use deadly force is evaluated from "the moment force was used." Id. 49. Therefore, Cloutier's Monday-morning quarterbacking of Sergeant Phillips and Officer Twine does not create a genuine issue of material fact.

In sum, Lee has failed to raise a genuine issue of material fact as to his assault and battery claim. Thus, the court grants the Town of Seaboard's motion for summary judgment on Lee's assault and battery claim.

B.

Lee alleges a state law negligence claim, and argues that Sergeant Phillips used excessive force against him and thereby breached a duty of care under North Carolina General Statute § 15A-

12

401. See Am. Compl. ¶¶ 59–67. "In a negligence action, a law enforcement officer is held to the standard of care that a reasonably prudent person would exercise in the discharge of official duties of like nature under like circumstances." Best v. Duke Univ., 337 N.C. 742, 752, 448 S.E.2d 506, 511–12 (1994) (quotation omitted); Bullins v. Schmidt, 322 N.C. 580, 582, 369 S.E.2d 601, 603 (1988); Williams, 165 N.C. App. at 429, 599 S.E.2d at 594.

Because Sergeant Phillips's conduct was justified under section 15A-401(d)(2), the court grants summary judgment to the Town of Seaboard on Lee's negligence claim. See Gillis, 2014 WL 1333988, at *7; London, 1996 WL 942865, at *9; Turner, 197 N.C. App. at 568–69, 677 S.E.2d at 484–85; accord City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986) (per curiam); Waybright v. Frederick Cty., 528 F.3d 199, 209 (4th Cir. 2008); Wilson v. Flynn, 429 F.3d 465, 469 n.* (4th Cir. 2005); Belcher v. Oliver, 898 F.2d 32, 36 (4th Cir. 1990). In light of this conclusion, the court need not address the Town of Seaboard's other arguments, including Lee's alleged contributory negligence. See, e.g., London, 1996 WL 942865, at *9; Hinton, 46 N.C. App. at 307–08, 264 S.E.2d at 778–79.

III.

In sum, defendant's motion for summary judgment [D.E. 64] is GRANTED, and plaintiff's motion for partial summary judgment [D.E. 66] is DENIED. Defendant may file a motion for costs in accordance with the Federal Rules of Civil Procedure and this court's local rules. The clerk shall close the case.

SO ORDERED. This 25 day of March 2016.

JAMES C. DEVER III
Chief United States District Judge